**Kenneth H. HAHN, named class representative, and O.J. Kelsey, named class representative, Plaintiffs,**

v.

**RIFKIN/NARRAGANSETT SOUTH FLORIDA CATV LIMITED PARTNERSHIP d/b/a Goldcoast Cablevision, et al., Defendants.**

No. 95–2471–CIV.

United States District Court, S.D. Florida.

Sept. 13, 1996.

Adam Lamb, David Azrin, Law Office of David T. Azrin, P.A., Miami, FL, Howard S. Weinberg, P.A., Miami, FL, for Plaintiffs.

Hector Rivera, Terry Bienstock, Bienstock & Clark, Miami, FL, for Defendants.

## ORDER ON PENDING MOTIONS

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Defendants' Motion to Dismiss, or in the Alternative, to Refer Matter to FCC Under Primary Jurisdiction, filed November 29, 1995; Defendants' Motion for More Definite Statement, filed November 29, 1996; Plaintiffs' Motion to Certify Class, filed February 6, 1996; and Defendants' Motion For Enlargement Of Time Within Which To File A Memorandum Of Law In Opposition To Plaintiffs' Motion To Certify Class, filed February 26, 1996. For the reasons set forth below, the Court grants Defendants' motion to dismiss and denies all other motions as moot.

## I. PROCEDURAL BACKGROUND

Plaintiffs Kenneth Hahn ("Hahn") and O.J. Kelsey ("Kelsey") bring this action against Defendants Rifkin/Narragansett South Florida CATV Limited Partnership d/b/a Gold Coast Cablevision, et al. ("Gold Coast") alleging predatory pricing and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2; the Federal Cable Act, 47 U.S.C., § 543(d); and the Florida Antitrust Act of 1980, Florida Statute § 542.19. Hahn and Kelsey seek both treble damages and injunctive relief. Gold Coast moves for dismissal of Hahn and Kelsey's federal claims on two separate grounds: lack of standing and failure to state a claim upon which relief can be granted. Alternatively, as to the antitrust claims Gold Coast moves the Court to refer the matter to the Federal Communications Commission ("FCC"). Other motions currently pending before the Court include Gold Coast's motion for a more definite statement, Hahn and Kelsey's motion for class certification, and Gold Coast's motion for enlargement of time to respond to the motion for class certification.

## II. FACTUAL BACKGROUND

1. Hahn and Kelsey bring the present action as putative representatives of a class of cable television subscribers who reside in high rise apartments located in Miami Beach and neighboring communities.

2. Gold Coast is a Florida limited partnership which provides cable television services to the aforementioned cable subscribers via equipment which runs over public easements pursuant to a nonexclusive franchise awarded by the City of Miami Beach.

3. Aventura Cable Corporation ("Aventura") provides cable television services via a satellite reception device which is placed directly on top of apartment buildings. According to the Complaint, Aventura and Gold Coast compete for cable subscribers in the Miami Beach high-rise market.

4. Gold Coast purportedly controls 90% of the Miami Beach high-rise cable television market.

5. Morton Towers is a high-rise apartment complex in Miami Beach that allegedly received television cable service exclusively from Gold Coast.

6. However, following a sealed bidding process, Morton Towers allegedly selected Aventura to replace Gold Coast as its provider of cable television services. In July of 1995, Aventura began installing its equipment for Morton Towers.

7. According to the Complaint, Gold Coast responded by drastically reducing the price of its cable television services to Morton Towers residents. In addition, Gold Coast allegedly implemented an advertising scheme that disseminated false and disparaging information about Aventura.[1]

8. Hahn and Kelsey, who are not residents of Morton Towers, allege that they pay significantly higher prices for Gold Coast cable services than do the residents of Morton Towers. They further allege that they will be harmed if Gold Coast obtains a monopoly by driving Aventura out of the Miami Beach high rise cable market.

## III. STANDING

■■■ Counts I and II of the complaint seek damages and injunctive relief for violations of the Sherman Act. The Sherman Act precludes any "attempt to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2. The defendants seek dismissal of these counts for lack of standing. The question of standing is one of law. *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1387 (11th Cir.1990). As such, the focus of the court's standing analysis should be on the allegations contained in the complaint. *Id.*; see also *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1448 (11th Cir.1991). In evaluating those allegations in the antitrust context, the court must look for more than a mere "case

or controversy" as is typically required by constitutional standing. *Todorov, supra,* at 1448. Rather, the court must undertake an analysis of "... prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov, supra,* at 1448 (citing *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983)). In order to meet this requirement, the court must find that the antitrust claimant is a proper plaintiff to enforce the antitrust laws. *Cargill, Inc. v. Monfort, Inc.* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986).[2] All of the above determinations must be made in accordance with the United States Supreme Court's mandate which directs district courts to "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors, supra,* 459 U.S. at 528 n. 17, 103 S.Ct. at 903 n. 17.

■■■ To determine whether a plaintiff has standing to seek damages for antitrust violations, the Eleventh Circuit applies a two prong test: "First, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." *Todorov, supra,* at 1449. In applying this test, the Eleventh Circuit adheres to the United States Supreme Court's definition of antitrust injury which is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by violation. It should, in short, be the type of loss that the claimed violation would be likely to cause.

*Todorov, supra,* at 1449 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S.

---

**1.** Gold Coast allegedly advertised that Aventura provided an inferior picture quality and did not have a local office. According to Hahn and Kelsey, these representations are false.

**2.** The court shall further discuss the requirements of this inquiry below.

477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Thus, to satisfy *Todorov's* first prong a private plaintiff must show that his personal injury "... coincides with the public detriment tending to result from the alleged violation ... increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition." *Todorov, supra,* at 1450 (quoting *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1389–90 (11th Cir. 1990)). Such a showing is vital to maintaining antitrust standing because "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his ... property." *Associated General Contractors, supra,* 459 U.S. at 535, 103 S.Ct. at 907 (citing *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 477 (1982)).

*Todorov's* second prong requires an analysis of "other factors in addition to antitrust injury." *Todorov, supra,* at 1450 (quoting *Cargill Inc. v. Monfort, Inc.,* 479 U.S. 104, 111 n. 6, 93 L.Ed.2d 427 (1986)). Such factors include the directness of the asserted injury in a causal sense and whether "... there were other parties ... who had suffered a more direct injury than the plaintiffs in the case." *Todorov, supra,* at 1451. Where there is the "... existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement ... the justification for allowing a more remote party privately to enforce the antitrust laws [are] diminished." *Todorov, supra,* at 1451. Another factor to consider is whether the plaintiff's damages claims are speculative. *Id.* at 1451. This particular evaluation is important where the plaintiff seeks damages which are more properly attributed to a less remotely injured party. Awarding damages to the plaintiff in this instance can lead to a duplicative recovery and thereby foster inefficient enforcement of the antitrust laws. *Id.* at 1451–52.

In *Todorov,* the Eleventh Circuit applied the foregoing factors in determining that a plaintiff neurologist lacked standing to bring an antitrust suit against a hospital and its radiology department. Specifically, the plaintiff neurologist alleged that the hospital and its radiologists controlled the CT scan market and thereby reaped the benefits of charging monopolistic prices. *Id.* at 1452.[3] His purported damages consisted of profits he would have gained had he been able to share a part of the radiologists' supercompetitive or monopolistic profits. *Id.* at 1452. These damages, however, did not constitute an "antitrust injury." Id. at 1454. Likewise, because the plaintiff neurologist was simply looking to increase his own profits, he was deemed to be a poor enforcer of the antitrust laws. *Id.* at 1452–55. Radiology patients, their insurers or the government were all deemed to be more efficient enforcers of the antitrust laws because they all had interests in ensuring that consumers pay a competitive price for medical services. Id. at 1455.

In the Southern District of Florida, the *Todorov* test has been applied in an even more stringent manner where the plaintiff, like the plaintiffs here, was a market consumer. In *Davis v. Southern Bell Telephone & Telegraph Co.,* 1994 WL 88981 (S.D.Fla. 1994) (Nesbitt, J.), the court held that telephone customers lack standing to bring claims for attempted monopolization. Specifically, a certified class of telephone customers alleged that Southern Bell implemented a series of marketing and sales techniques which led them to mistakenly believe that Southern Bell was the only phone company that could effectively provide an internal wire maintenance service. In so doing, Southern Bell allegedly captured 85% of the inside wire repair market. *Id.* at *2. The court, however, determined that "... when defendants engage in predatory pricing and other anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market is the party with standing." *Id.* at *15. The court added that consumers suffer an antitrust injury "... only when the defendants achieve a monopoly and are in a

---

**3.** The plaintiff neurologist had filed an application with an Alabama hospital seeking radiology privileges which would have enabled him to participate in the market for administering CT scans of the head. *Id.* at 1441. However, the hospital's review panel ultimately rejected the plaintiff's application. *Id.* at 1452.

position to harm consumers by engaging in monopoly overcharging.". *Id.* at *15–16.

■ In this case, Hahn and Kelsey do not allege that Gold Coast is engaged in monopolistic overcharging. Quite the contrary, they allege that Gold Coast engaged in a predatory pricing scheme to drive Aventura out of Morton Towers. In bringing their present antitrust suit, Hahn and Kelsey seek to profit from Gold Coast's anticompetitive behavior by paying the same purported predatory prices as were offered to the residents of Morton Towers. Thus, their alleged injury is not the type the antitrust laws were intended to prevent. *Todorov, supra,* at 1453. Moreover, it appears evident from the face of the Complaint that there is another party who has suffered a more direct injury, namely Aventura. Therefore, pursuant to *Todorov, supra,* and *Davis, supra,* the Court finds that Hahn and Kelsey lack standing to bring an action for antitrust violations. Accordingly, the Court dismisses Counts I and II with prejudice.

## IV. VIOLATION OF THE FEDERAL CABLE ACT

■ In Count III of their Complaint, Hahn and Kelsey assert a claim for violation of the Federal Cable Act ("FCA"). Specifically, they allege that Gold Coast's predatory pricing scheme violated the FCA requirement that a cable operator maintain "a rate structure, for the provision of cable service, that is uniform throughout the geographic area in which cable service is provided over its cable system." 47 U.S.C. § 543(d). Although § 543(d) of the FCA does not expressly provide for a private right of action, Hahn and Kelsey argue that the statute creates an *implied* right.

The Supreme Court utilizes four factors to determine whether a private remedy is implicit in a statute that does not expressly provide for one:

First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted ...[; s]econd, is there any indication of legislative intent ... either to create such a remedy or to deny one ...[; t]hird, is it consistent with the underlying purposes of the legislative scheme to imply

such a remedy ...[; a]nd finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original) (citations omitted).

■ With regard to the first factor, the Court must determine whether Congress intended to confer upon cable subscribers an "especial" benefit. The uniform rate provision of the FCA is designed to preclude "charging different subscribers different rates with no economic justification and unfairly undercutting competitors' prices." *Time Warner Entertainment Co., L.P. v. F.C.C.,* 56 F.3d 151, 190 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996) (quoting *Implementation of Sections of the Cable Television Consumer Protection & Competition Act of 1992: Rate Regulation, Third Order on Reconsideration,* 9 F.C.C.R. 4316, 4327 (1994)). As such, the provision benefits *both* cable subscribers *and* nascent or expanding cable operators. *See Time Warner,* 56 F.3d at 190. Upon such a determination, this Court cannot find that Section 543(d) is intended for the "especial benefit" of cable subscribers. *See Mallenbaum v. Adelphia Communications Corp.,* 1994 WL 724981 *6 (E.D.Pa. Dec. 29, 1994), *aff'd,* 74 F.3d 465, 469–70 (3rd Cir. 1996) (finding that since both cable subscribers and cable operators benefit, cable subscribers are not the "especial beneficiaries" of the FCA). Accordingly, Hahn and Kelsey's reliance upon *Centel Cable Television v. Admiral's Cove Associates,* 835 F.2d 1359 (11th Cir.1988) is misplaced. In *Centel,* the Eleventh Circuit determined that Congress intended to create a private right of action under § 621(a)(2) of the FCA because that section granted an "especial benefit" to one specific group. *Centel,* 835 F.2d at 1362. Since this Court cannot label cable subscribers as "especial beneficiaries" of § 543(d) of the FCA, it cannot conclude that a private remedy is implicitly available to cable subscribers.

Pursuant to the second *Cort* factor, this Court must next determine whether Congress intended to provide a private cause of action. The Supreme Court "has noted that there would be far less reason to infer a private remedy in favor of individual persons where Congress, rather than drafting the legislation with an unmistakable focus on the benefited class, instead has framed the statute simply as a general prohibition or a command...." *Universities Research Association v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981). In *Coutu,* the Supreme Court held that a minimum wage provision in the Davis–Bacon Act designed for the benefit of construction workers nevertheless did not confer rights directly upon those individuals. Rather, the statute was "simply phrased as a directive" regarding the disbursement of funds. *Id.* at 772–73, 101 S.Ct. at 1462–63. Similarly, the uniform rate provision of the FCA is phrased as a directive to cable operators. Section 543(d), in pertinent part, states as follows: "A cable operator shall have a rate structure ... that is uniform...." Nothing in that provision suggests an intention to confer rights directly on individuals who may nevertheless benefit from the provision.

Moreover, "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1971). For example, cable subscribers have a private right of action for violation of their privacy (47 U.S.C. § 551(f)); cable operators may appeal a franchising authority's denial of a franchise renewal request (47 U.S.C. § 546(e)); a person may sue in federal court if aggrieved by the failure of a cable operator to make available channel capacity (47 U.S.C. § 532(d)); and a person harmed by unauthorized interception of cable service may sue in federal court (47 U.S.C. § 553(c)). Therefore, Congress' express provision of private remedies under several sections of the FCA militates heavily against a finding that Congress chose to *impliedly* provide a private remedy under § 543(d).

Finally, other courts agree that no implied right of action exists under Section 543 of the FCA. *See, e.g., In re Comcast Corp.,* 1994 WL 622105 *4–5 (E.D.Pa. Nov. 10, 1994), *aff'd,* 77 F.3d 462 (3rd Cir.1996); *Kentucky v. Comcast Cable of Paducah, Inc.,* 881 F.Supp. 285, 287–88 (W.D.Ky.1995); *Florida v. Comcast Corp.,* No. 94–40316 (N.D.Fla. Sept. 28, 1994) (order granting plaintiff's motion to remand): *Pennsylvania v. Comcast Corp.,* 1994 Lexis 568479 *4 (E.D.Pa. Oct. 11, 1994) (order remanding case). This Court joins its sister federal courts. Since the first two *Cort* factors do not support a finding of an implied right under § 543(d), it is unnecessary to address the remaining factors. *See Mallenbaum,* 74 F.3d at 470. Therefore, the Court dismisses Count III with prejudice.

## VI. CONCLUSION

Based upon the foregoing considerations, it is

ORDERED AND ADJUDGED as follows:

1. Defendants' Motion to Dismiss, or in the Alternative, to Refer matter to FCC Under Primary Jurisdiction (D.E. # 4; Parts 1 and 2), filed November 15, 1995, is GRANTED to the extent it seeks dismissal of Counts I, II and III. Counts I, II and III are DISMISSED WITH PREJUDICE. Said motion is DENIED in all other respects.

2. Having dismissed Counts I, II and III WITH PREJUDICE, the Court declines to exercise pendent jurisdiction over Plaintiffs' state law claim contained in Count IV of the Complaint. Therefore, Count IV is DISMISSED WITHOUT PREJUDICE.

3. Defendants' Motion for More Definite Statement (D.E. # 6), filed November 15, 1996, is DENIED AS MOOT.

4. Plaintiffs' Motion to Certify Class (D.E. # 22), filed February 6, 1996, is DENIED WITHOUT PREJUDICE AS MOOT.

5. Defendants' Motion for Enlargement of Time, filed February 26, 1996, is DENIED WITHOUT PREJUDICE AS MOOT.

6. All other motions not otherwise ruled upon are denied as moot and this case is CLOSED.