**Scott SIMPSON and Stephanie Simpson, on behalf of themselves and all others similarly situation, Plaintiffs,**

v.

**US WEST COMMUNICATIONS, INC., a corporation, Defendant.**

**Civil No. 96–456–RE.**

United States District Court, D. Oregon.

Jan. 29, 1997.

John J. Carey, Joseph P. Danis, Carey & Danis, L.L.C., St. Louis, MO, Dan W. Clark, Dole, Coalwell & Clark, P.C., Roseburg, OR, for Plaintiffs.

Michael H. Simon, Andrew J. Bowman, Perkins Coie, Portland, OR, for Defendant.

## OPINION

REDDEN, District Judge:

### BACKGROUND

Plaintiffs, Scott and Stefanie Simpson, filed this class action lawsuit against defendant, US West Communications, Inc., challenging defendant's marketing and sale of optional inside wire maintenance service plans (IWMS) to its telephone customers in Oregon. The parties have stipulated and the court has ordered that the matter of class certification would be addressed, if necessary, following the ruling on defendant's summary judgment motion. Therefore, the procedural posture of the litigation at this time is a case of two individual plaintiffs asserting personal claims against the defendant. *See Wright v. Schock,* 742 F.2d 541, 545 (9th Cir.1984).

Plaintiffs allege six claims for relief: monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Claim 1); fraudulent misrepresentation and omission (Claim 2); breach of contract (Claim 4); unjust enrichment (Claim 6); restitution (Claim 7); and declaratory and injunctive relief (Claim 8). Pursuant to this court's Order dated August 15, 1996, Claim 3 (negligent misrepresentation) and Claim 5 (breach of the implied covenant of good faith and fair dealing) were dismissed. Defendant's summary judgment motion is granted and this case is dismissed.

The facts are not in dispute here. I rely on the "Agreed Facts" set forth separately as Exhibit A attached to the Pretrial Order (filed December 9, 1996), p. 13–16.

### STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.,* 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be re-

solved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630.

### CLAIMS

### VIOLATION OF § 2 OF THE SHERMAN ACT—CLAIM ONE

Plaintiffs contend that prior to 1987, defendant maintained a monopoly for IWMS in Oregon pursuant to a monopoly franchise with Oregon that permitted defendant to "bundle" IWMS with basic telephone services. Defendant was later directed by the FCC and the OPUC to unbundle IWMS in order to create effective competition for the service.

Plaintiffs contend that defendant's deceptive and misleading solicitations for IWMS— including announcements sent to telephone customers—effectively coerced customers into purchasing IWMS from defendant by: (a) misleading customers into believing that they needed IWMS; and (b) leading customers to believe that defendant was the only effective provider of the service.

■ To prove a claim for monopolization, a plaintiff must establish two elements: (1) the possession of monopoly power in the relevant market; and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 541 (9th Cir.1991), *cert. denied,* 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) (quotation omitted). In addition, "antitrust injury" must also be proven in all private antitrust actions. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.), *cert. denied,* ── U.S. ──, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995) (citation omitted).

■ Plaintiffs cannot prove monopoly power. Defendant supplies less than 44% of its customers with IWMS. Although that evidence is not controlling, it is persuasive, particularly when considered with evidence that anyone, including consumers themselves, can participate in this market and provide substitute wire repair service. *See Dimmitt Agri Industries, Inc. v. CPC International, Inc.,* 679 F.2d 516, 528 (5th Cir.1982), *cert. denied,* 470 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); and *United States v. E.I. Du Pont De Nemours & Co.,* 351 U.S. 377, 395, 399, 76 S.Ct. 994, 1007, 1009, 100 L.Ed. 1264 (1956). Further, plaintiffs fail to submit an affidavit from any competitor or potential competitor in support of their statement that competitors face "overwhelming barriers to entry" into the market of providing customers with IWMS. Plaintiffs also fail to offer any case authority or expert witness affidavits for their statement that a wire maintenance service plan can be a relevant market under the antitrust laws. I find that the relevant market is inside wire repair, not inside wire repair "plans."

I find no evidence that defendant engaged in exclusionary or predatory conduct as to plaintiffs' claims for actual monopolization or attempted monopolization.

> Section 2 does not prohibit vigorous competition on the part of a monopoly[.] What Section 2 *does* prohibit is "exclusionary" conduct defined as "behavior" that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 883 F.2d 1101, 1110 (1st Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (quotations omitted)

■ Defendant's marketing and sales practices for IWMS in Oregon do not constitute exclusionary or predatory conduct. Defendant marketed inside wire service in Oregon only through "positive option" marketing, never through a "negative option." The mere fact of raising prices, or even charging supracompetitive prices, is not anticompetitive and is not unlawful in and of itself.

> [U]nless the monopoly has bolstered its power by wrongful actions, it will not be required to pay damages merely because its prices may later be found excessive.

Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive.

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

I find *no* evidence of impairment of rivals. As early as 1983, Pacific Northwest Bell (PNB) told customers in writing that they had "several options" for maintaining their inside wiring, including "have PNB (or someone else) charge you for actual time spent." More recently, in 1993, in a notice defendant sent to its customers informing them of an upcoming price increase, defendant stated:

Basic Wire Maintenance, Line–Backer and Line–Backer Plus are optional services. You are not required to purchase this service in order to have basic telephone service. If you wish to cancel the service at any time, you may do so at no charge. You do have options for repair of inside telephone wire. You may hire another company, do it yourself, or call [the defendant].

Defendant provided these same disclosures in its announcement of its 1996 price increase.

*Davis*, relied on by plaintiffs, is distinguished. *Davis* involved the use of "negative option" contracts to enroll customers in Southern Bell's inside wire maintenance service. An earlier decision by the court in this case held, "The [FCC] has stated that default procedures, or negative options, such as the ones used by Southern Bell, are anticompetitive." *Davis v. Southern Bell Telephone & Telegraph Co.*, 755 F.Supp. 1532, 1533 (S.D.Fla.1991). The percentage of Southern Bell's customers who were enrolled in its inside wire maintenance plans was approximately 85%, versus less than 44% in our case. Finally, those plaintiffs submitted three expert witness affidavits describing the *specific* competitive situation in that particular market. No such evidence exists here.

■ Finally, I find no evidence of antitrust injury, specifically, I find no evidence that plaintiffs' alleged injury "flow[s] from aspects of the defendant's conduct" that are adverse to competition. *Rebel Oil Co.*, 51 F.3d at 1433 ("If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se").

Contrary to plaintiffs' argument, the Supreme Court has held that a "forced purchase" of an unwanted product is *not* an "antitrust injury."

When a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

*Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984).

Their claim that they would not have purchased IWMS but for defendant's challenged conduct does not allege the requisite "antitrust injury." Plaintiffs' failure to show an "antitrust injury" defeats both plaintiffs' claims for actual and attempted monopolization. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 583, 136 L.Ed.2d 513 (1996) (antitrust injury is an element of a claim for monopolization); and *Rebel Oil*, 51 F.3d at 1433 (antitrust injury is an element of a claim for attempted monopolization).

■ Further, plaintiffs, as consumers, lack standing to bring a claim for attempted monopolization. Since there is not a certified class, I look to the individual plaintiffs' status to determine standing. To prove a claim for attempted monopolization, a plaintiff must establish that (1) a defendant has engaged in anticompetitive conduct; (2) with the specific intent to obtain monopoly power; and (3) a dangerous probability exists that the attempt will succeed within the relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

when defendants engage in ... anticompetitive acts in an attempt to gain a mo-

nopoly, the competitor who is being driven out of the market is the party with standing. Only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers.... The most likely enforcer is the immediate victim of the illegal conduct—namely, the competitor weakened or ruined by the improper conduct. Similarly, a consumer cannot obtain damages without showing that he actually paid more than the competitive level.

*In re Air Passenger Computer Reservation Systems,* 727 F.Supp. 564 (C.D.Cal.1989).

In *Davis v. Southern Bell Tele & Telegraph Co.,* 1994–1 Trade Cas. (CCH) para. 70,510, 1994 WL 88981 (S.D.Fla.1994), the court adopted in full the reasoning of *In re Air Passenger.* The plaintiffs in *Davis,* all customers of Southern Bell's inside telephone wire repair plans, brought a claim for attempted monopolization. The court dismissed that claim, holding that consumers do not, as a matter of law, have standing to assert a Section 2 "attempt" claim. *Davis,* at 71,770 ("only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to consumers") (quotation omitted).

Plaintiffs' antitrust claims, both actual and attempted, are dismissed.

### FRAUDULENT MISREPRESENTATION AND OMISSION—CLAIM TWO

I find no false, misleading and deceptive representations to customers or omissions of material facts in connection with the solicitation of IWMS. Defendant's summary judgment motion is granted.

■ Under Oregon law, a party cannot recover for fraud based upon nondisclosure of material facts unless the defendant had a duty to disclose. *Gebrayel v. Transamerica Title Ins. Co.,* 132 Or.App. 271, 281, 888 P.2d 83, *rev. denied,* 321 Or. 47, 892 P.2d 1024 (1995) (citation omitted). A duty to disclose exists when the parties are in a "fiduciary relationship," *Gebrayel,* 132 Or.App. at 281, 888 P.2d 83, or possibly a "special relation-

ship," as that term is defined under Oregon law.

Plaintiffs cannot prove either a special or fiduciary relationship. In my August 15, 1996, Opinion, I held that there is no "special" relationship between plaintiffs and defendant, and found as a matter of law, that a telephone company is not in a "fiduciary relationship" with its customers. Opinion, p. 4. Therefore, because there is no "special" or "fiduciary" relationship between plaintiffs and defendant, defendant was not under a duty to disclose and summary judgment is granted on this claim.

Regarding plaintiffs' allegation that defendant affirmatively misrepresented that apartment tenants are responsible for maintaining inside wire—plaintiffs cite no evidence to support this. Further, plaintiffs are not apartment dwellers, so this allegation is irrelevant.

Plaintiffs next allege that defendant represented to its customers "that the service was for their economic benefit, when in fact the service was very profitable for the phone company to the customer's detriment." Plaintiffs' Opposition, p. 31. Plaintiffs' cite Ex. H in support. However, Ex. H, which referred to the price of defendant's Line–Backer service at $1.00 per month, must have been prepared before August 1988 when the price was increased to $1.55. Plaintiffs offer no evidence that they ever saw, or relied upon, Exhibit H. Further, that exhibit does not support plaintiffs' allegation.

Finally, plaintiffs allege that defendant "represented that its negative option increases were a reflection of the increase in cost of living." Plaintiffs' Opposition, p. 31. The only evidence cited by plaintiffs is the deposition testimony of a defendant employee commenting on America Online's current pricing program. *See* Plaintiffs' Ex. T. Plaintiffs offer no evidence that any such representation was ever made by defendant to them, or even to any other defendant customer.

■ Further, with one exception, defendant did disclose the information plaintiffs' allege was not disclosed. The one exception is plaintiffs' allegation that defendant "failed to disclose its own knowledge regarding the

very low frequency with which the maintenance service offered by it would be required by residential customers." Plaintiffs' Opposition, p. 35. I decline to hold that sellers of service contracts, service warranties, and extended warranties are under an affirmative legal *duty* to maintain and disclose to their customers the frequencies that such services are actually used by purchasers.

### BREACH OF CONTRACT— CLAIM FOUR

Plaintiffs contend that they entered into a contract with defendant for IWMS. By reason of defendant's allegedly deceptive and misleading solicitations, plaintiffs were unlawfully coerced or induced into entering into this contract. Defendant allegedly materially breached this contract by failing to perform as promised and by charging unfair and excessive prices. Defendant's motion is granted.

■ Plaintiffs' allegation that defendant charged "excessive" prices for IWMS does not state a claim for breach of contract. There is no allegation or evidence that plaintiffs did not agree to pay defendant's specified monthly charge as a condition of receiving IWMS from defendant. Because plaintiffs expressly agreed to pay defendant's specified monthly charge, plaintiffs cannot base their breach of contract claim on an allegation that the monthly charge was "unfair" or "excessive."

I have earlier ruled that plaintiffs' failure to allege that they did not agree to defendant having discretion to raise prices after prior notice precluded plaintiffs' claim that defendant is liable based on the price charged. Opinion, pp. 204–205. *See also, Tolbert v. First National Bank of Oregon,* 312 Or. 485, 823 P.2d 965 (1991):

> when (1) the parties agree to (and their contract provides for) a unilateral exercise of discretion regarding changes in one of the contract terms, and (2) the discretion is exercised after prior notice—we hold as a matter of law that the parties' reasonable expectations have been met.

*Id.,* 312 Or. at 494, 823 P.2d 965.

■ Defendant's Terms and Conditions expressly give defendant the ability to increase prices after prior notice to its customers. Following such notice, customers are free to cancel IWMS, which plaintiffs did in March 1996. Even without a pending price change, a customer may cancel IWMS at any time, without penalty. Further, precedent exists to allow telephone companies to enter into contracts by the exact methods used by defendant to form its inside wire maintenance service contracts in Oregon. *See Berjian v. Ohio Bell Tel. Co.,* 54 Ohio St.2d 147, 375 N.E.2d 410, 414 (Ohio 1978) (terms and conditions contained in the directory advertising agreement constituted an enforceable contract between the parties).

Defendant did not increase the price of IWMS to plaintiffs (during the time period that plaintiffs subscribed to the service); and plaintiffs do not claim that they canceled IWMS due to announced price increase. For these reasons, plaintiffs cannot maintain their claim that defendant breached its contract with them.

Further, defendant's written "Terms and Conditions" are sent to customers of its IWMS plans within several days after a customer first signs up for that service. Plaintiffs admit receiving a copy. This notice clearly states that defendant may increase the monthly charge for IWMS following 30 days prior notice. These facts preclude a claim for breach of contract premised upon defendant's price increase.

### CLAIMS SIX, SEVEN AND EIGHT

Plaintiffs' claims for unjust enrichment, restitution, declaratory injunctive and equitable relief are dismissed as plaintiffs did not prevail on their underlying claims.

### CONCLUSION

Defendant's summary judgment motion is GRANTED as to all claims. This case is dismissed.