Margaret WOJCIESZEK, Paul J. Milluzzo and Richard E. LaBonte d/b/a LaBonte Investigations, Plaintiffs,

v.

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY and Nynex Corporation, Defendants.

C.A. No. 96–30037–MAP.

United States District Court, D. Massachusetts.

Sept. 26, 1997.

Timothy P. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, MA, Steven L. Owen, Kevin T. McGraw, Scott L. Mandel, Foster, Swift, Collins & Smith, Lansing, MI, for Plaintiffs.

Thomas R. Teehan, Boston, MA, Kevin J. Arquit, James G. Cavoli, Roger & Wells, New York City, James C. Egan, Jr., Washington, DC, for New England Tel. & Tel. Co.

Thomas R. Teehan, Boston, MA, for Nynex Corp.

### MEMORANDUM REGARDING DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiffs subscribe to an inside telephone wire maintenance service ("IWMS") plan offered by defendants New England Telephone and Telegraph Company and NYNEX Corporation ("NET" and "NYNEX"). This plan covers a telephone subscriber for potential repairs to the telephone lines that run through the dwelling to the phone jack. Until 1986 the defendants had an effective monopoly on these services, for which a customer paid as part of his or her telephone bill.

As of January 1, 1987, the Massachusetts Department of Public Utilities ("MDPU") caused the defendants to offer IWMS as an "optional" service, separate from regulated telephone service, in order to increase competition and promote the entry of new companies into the market for IWMS.

Plaintiffs have brought this action alleging that defendants' sale of their IWMS plan constitutes (1) a violation of the Sherman Act through monopolization (Count I); and (2) a violation of the Sherman Act through an attempt to monopolize (Count II). Plaintiffs also assert two common law claims for money had and received (Count III) and breach of duty of good faith and fair dealing (Count IV) They also allege a violation of Mass. Gen. L. ch. 93A (Count V).

In response to the complaint, defendants have filed a motion to dismiss all claims. To summarize, defendants have moved to dismiss the federal claims on two grounds: first, that the allegations contained within the com-

plaint fail to state a claim upon which relief can be granted, and, second, that plaintiffs lack standing to bring an attempted monopolization claim. Assuming the absence of any viable federal claims, defendants also seek dismissal of the state law claims.

For the reasons set forth below, the court will allow defendants' Motion to Dismiss with regard to Count I and Count II of the complaint and will exercise its discretion to dismiss the state claims on the authority of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

To summarize the court's holding, the four corners of the complaint (despite a liberal use of the argot of antitrust) offer no more than a "deceptive practices" or common law fraud case, at best, masquerading as a Sherman Act case. Plaintiffs not only have failed to plead monopoly power in any relevant market, but in effect have conceded the *absence* of any barriers to entry into the market. Moreover, they have failed, by any reasonable construction of the complaint, to allege any injury to *competition*. Plaintiffs also lack standing, as several courts have now recognized, to assert any attempted monopolization claim. Finally, plaintiffs' "leveraging" theory lacks viability as a matter of law.

## II. FACTS

In assessing the adequacy of the complaint, this court must follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). This generous rule will not, however, rescue an anti-trust complaint "containing vague pleadings lacking the requisite factual allegations of an antitrust claim...." *Day v. Fallon Community Health Plan, Inc.*, 917 F.Supp. 72, 75 (D.Mass.1996). The facts, as drawn from the complaint, may be summarized as follows.

Before 1987, defendants' charges for IWMS services were "bundled" with, and not distinguishable from, telephone customers' monthly charges for regulated basic telephone services.[1] Am. Compl. at ¶ 15. Sometime after January 1, 1987, defendants began to offer IWMS as an "optional" service separate from regulated telephone operations.

According to the complaint, defendants nevertheless maintained and expanded their monopoly in IWMS, by "coercing" their customers to accept and maintain IWMS through false, misleading, fraudulent and/or deceptive acts. *Id.* at ¶ 20. Specifically, plaintiffs allege that defendants misrepresented or inadequately disclosed:

(1) the essential terms, conditions, exclusions and limitations regarding what IWMS purportedly offered;

(2) the fact that inside wiring installation and repairs were "usually simple" and could be performed by independent contractors or consumers themselves;

(3) the infrequency with which maintenance of inside wire would be needed; and

(4) the fact that IWMS was "optional" and, therefore, not required in order to receive regulated utility service.

The court pauses here to note that although the complaint is freighted with words such as "wilfulness" and "misrepresentation," it offers facts supporting only a claim that defendants failed to disclose certain information, not that they affirmatively misled the plaintiffs. The heart of plaintiffs' claim of anti-competitive behavior is their allegation that defendants *failed to disclose* that inside wire installation and repair could be performed by independent contractors or the plaintiffs themselves. In other words, defendants are not charged with affirmatively stating that plaintiffs or independent contractors could *not* perform IWMS services, but merely with failing to notify plaintiffs that they (or someone else) could.

Plaintiffs further allege that defendants modified the existing "contract" for IWMS

---

**1.** Defendants, in fact, offered a variety of services, which the court will call IWMS services for ease of reference.

through a so-called "negative option" or "default" sales scheme. Under this practice, the billing inserts either simply informed customers of contract modifications without calling for a response, or required customers to notify defendants if they chose *not* to accept new conditions. These inserts purported to give the defendants the unilateral right to modify the price, terms and conditions of IWMS at any time, on one month's notice to customers. *Id.* at ¶¶ 21–22.

Again, because the complaint is somewhat misleading on this point, it is necessary to pause and comment. Plaintiffs do *not* allege that their decision to *begin* receiving IWMS services from the defendants was foisted upon them through what has been called a "negative option." A true "negative option" occurs where a consumer is told he or she will begin automatically receiving services, and being billed for them, unless he or she affirmatively *declines* to accept the services. It is undisputed that in Massachusetts all defendants' customers were presented with the choice to receive the IWMS services and only received them if they affirmatively *elected* to take them. This is not therefore, in any significant sense, a "negative option" case. Plaintiffs only allege that, once plaintiffs affirmatively chose to receive IWMS services from defendants, subsequent changes in pricing or services were communicated to plaintiffs with the advice that plaintiffs could terminate the services if they did not wish to accept the changes. This rather innocuous fact does *not* make this a "negative option" case, despite plaintiffs' out-of-context use of this buzz-phrase.

To return to the complaint, plaintiffs allege that defendants' ability to control, dominate and unilaterally increase the cost of unregulated services has allowed them to monopolize the market in Massachusetts for IWMS and unlawfully leverage their monopoly power over regulated utility telephone service and billing to foreclose competition in deregulated markets and services. *Id.* at ¶ 22. Plaintiffs maintain that defendants' pattern of deceptive practices has given them an unfair advantage over plaintiffs by inducing them to participate in and pay for IWMS, to which they would not have agreed had full

and fair disclosure been made by defendants. *Id.* at ¶ 23.

According to plaintiffs, the relevant service market(s) are: (1) the market for inside wire installation; and/or (2) the market for inside wire maintenance service; and/or (3) the market for "insurance" for inside wire maintenance service. *Id.* at ¶ 28. The relevant geographic market is the monopoly franchise service area in the Commonwealth of Massachusetts served by defendants. *Id.* at ¶ 29.

Plaintiffs further allege that defendants have exclusive control of, and access to, a "bottleneck" facility—the monthly telephone billing envelope—in which bills are mailed to customers, including plaintiffs. According to plaintiffs, defendants are able to solicit customers through their access to this "facility" at a cost substantially below what competitors would have to pay to obtain comparable access to consumers of IWMS. In addition, defendants maintain a number of "service representatives" to provide information and service to plaintiffs. These service representatives, plaintiffs say, constitute a subsidized sales force which defendants have employed to create and maintain their monopoly in IWMS. *Id.* at ¶ 36.

Based upon defendants' allegedly deceptive acts, the leveraging of their monopoly of phone services and their control of the monthly billing envelope, plaintiffs allege monopolization and attempted monopolization in violation of section 2 of the Sherman Act, and accordingly seek treble damages, attorney's fees and prejudgment interest against the defendants.

### III. DISCUSSION

In essence, plaintiffs contend that the defendants have monopolized, or attempted to monopolize, the market in Massachusetts for inside telephone wire services by "coercing" their customers to accept IWMS through false, misleading, fraudulent and/or deceptive acts—or, more properly, omissions—contrived to mislead customers into believing that: (a) they need IWMS; and (b) defendant is the only company that can provide the service effectively. The court will address the monopolization and attempted monopolization claims in turn.

## A. MONOPOLIZATION

To allege a claim for monopolization under the Sherman Act, a plaintiff must plead two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power through *anti-competitive* means, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)); *see also* 15 U.S.C.A. § 2 (West Supp.1996). In addition, "antitrust injury" must also be proven in all private antitrust actions. *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

The complaint here simply lacks allegations sufficient to make out these fundamental elements of a monopoly claim. For example, plaintiffs fail to allege defendants' share of any relevant market regarding IWMS. They also fail to allege any competitors' share of such a market. In fact, plaintiffs not only fail to plead monopoly power, they admit that defendants *cannot* attain such power. They acknowledge that anyone, including consumers themselves, can penetrate the market for IWMS. Am. Compl. at ¶ 20A ("Inside wiring installation and repairs are usually simple and may readily be performed by independent contractors or consumers themselves.").

A supplier cannot control prices in a market in which anyone, including consumers, can participate and provide substitute services. Where prices cannot be controlled, there is no danger that a supplier will obtain and exercise monopoly power. "It is inconceivable that price could be controlled without power over competition or vice versa." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

Further, plaintiffs fail to offer facts supporting a claim that any competitor or potential competitor faces any barriers to entering the IWMS market.[2] They present no facts to support their allegations that defendants have the power to exclude competition or "fix" prices.

Such pleading deficiencies are precisely the type that have prompted courts to dismiss section 2 claims. *See Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 487–88 (D.C.Cir.1996) (affirming dismissal where complaint failed to allege defendants' or competitors' market shares, failed to allege defendants' power to exclude competition, and failed to allege that the relevant market was capable of being monopolized); *Hennessy Indus., Inc. v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir.1985) (affirming dismissal where complaint failed to "set forth any facts from which [to] infer that defendants had sufficient market power to have been able to create a monopoly"); *Americana Indus. v. Wometco de Puerto Rico*, 556 F.2d 625, 627–28 (1st Cir.1977) (dismissing claim where complaint failed "to allege facts and circumstances tending to show that defendant had substantial market power"); *Day v. Fallon Community Health Plan, Inc.*, 917 F.Supp. 72, 75 (D.Mass.1996) (complaint lacking requisite factual allegations of antitrust claim is insufficient to state cause of action); *Int'l Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F.Supp. 1207, 1217–18 (S.D.N.Y.1994) (failure to allege data regarding market share is grounds for dismissal), *aff'd*, 62 F.3d 69 (2d Cir.1995); *Valet Apartment Servs., Inc. v. Atlanta Journal & Const.*, 865 F.Supp. 828, 831–33 (N.D.Ga. 1994) (complaint failed to allege market shares of participants, number of actual or potential competitors, or defendants' market power); *Letica Corp. v. Sweetheart Cup Co.*, 790 F.Supp. 702, 704 (E.D.Mich.1992) (mere conclusory allegations are not sufficient to state cause of action, particularly in complex litigation such as alleged violations of Sherman Act).

In *Dial A Car*, the D.C. Circuit Court of Appeals stated that, even if monopoly power

---

**2.** Plaintiffs' argument that they themselves are competitors is addressed below.

is likely, dismissal is appropriate where the "complaint does not allege any barriers that would prevent entry into the market" and where the pleadings concede that there are "other . . . providers poised to take business away from any company attempting to exercise monopoly power by raising rates." 82 F.3d at 488.

■ Plaintiffs allege that defendants' access to the monthly billing envelope constitutes a "bottleneck" facility sufficient to prevent entry into the market. They maintain that defendants are able to solicit customers through their access to this so-called facility at a cost substantially below what competitors would have to pay and that defendants' service representatives constitute a "subsidized sales force." However, these mere allegations are insufficient as a matter of law.

■ To prevail on a monopolization claim under the "essential facilities" doctrine, plaintiffs must show that: (1) defendants are in control of a facility essential to competition; (2) plaintiffs are unable to duplicate, practically or reasonably, access provided by the facility; (3) defendants denied the plaintiffs use of the facility; and (4) it would be feasible for defendants to provide the facility to plaintiffs. *City of Chanute, Kan. v. Williams Natural Gas Co.,* 955 F.2d 641, 647 (10th Cir.1992), *cert. denied,* 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992) (citing *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)).

Here, plaintiffs offer no facts to support any allegation that they are unable to duplicate the supposed "facility," and fail even to allege that defendants have denied any request to use the facility, or that it would be feasible for defendants to provide this facility to plaintiffs. Beyond this, plaintiffs' argument yanks the "essential facilities" doctrine completely off its moorings. This is not a case, like *Chanute,* where the defendant operated the only natural gas pipeline to a large geographic area and where duplication of the pipeline was not physically feasible. Plaintiffs have offered no authority suggesting that a billing envelope might constitute an "essential facility."

## B. ANTITRUST INJURY

■ Even if the complaint contained facts to support the existence of monopoly power in the IWMS market, it still would have to be dismissed for the independent reason that it offers no facts suggesting antitrust injury and no evidence that plaintiffs' alleged damages result from the defendants' unlawful acts. "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se.*" *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.) *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

■ The requirement that an antitrust injury be alleged is not satisfied by plaintiffs' claim that they would not have purchased IWMS but for defendants' conduct. To the contrary, the Supreme Court has held that an unwanted product, or a "forced purchase" is not an "antitrust injury."

> [W]hen a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984).

Plaintiffs' failure to show an "antitrust injury" defeats plaintiffs' claims for both actual and attempted monopolization. *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 783 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 583, 136 L.Ed.2d 513 (1996) (plaintiff must show causal antitrust injury to prove claims for monopolization and attempt to monopolize).

## C. ATTEMPTED MONOPOLIZATION

■ Plaintiffs' lack of standing to bring a claim for attempted monopolization would require dismissal of this count in any event. To state a claim for attempted mo-

nopolization, a plaintiff must show: (1) that a defendant has engaged in anti-competitive conduct; (2) with the specific intent to obtain monopoly power; and (3) a dangerous probability exists that the attempt will succeed within the relevant market. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 851 (1st Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). In addition, plaintiffs must plead and prove standing.

> [W]hen defendants engage in ... anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market is the party with standing. Only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers.... "[T]he most likely enforcer is the immediate victim of the illegal conduct— namely, the competitor weakened or ruined by the improper conduct." *Similarly, "a consumer cannot obtain damages without showing that he actually paid more than the competitive level."*

*In re Air Passenger Computer Reservation Sys.,* 727 F.Supp. 564, 568–69 (C.D.Cal.1989) (emphasis supplied) (footnote omitted) (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 337.1, 340.26 (1988 Supp.)).

The reasoning of *In re Air Passenger* was adopted by the court in *Davis v. Southern Bell Tel. & Tel. Co.,* No. 89–2839–CIV–NESBITT, 1994 WL 912242, at *16 (S.D.Fla. Feb. 1, 1994). The plaintiffs in *Davis* were IWMS customers who brought a claim for attempted monopolization against Southern Bell. The court dismissed that claim holding that consumers did not have standing to assert a section 2 "attempt" claim as a matter of law. *Id.* ("[O]nly when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to consumers.").

Plaintiffs have argued, in their legal memoranda and at a hearing held before this court, that they are not only consumers of defendants' services, but are also themselves competitors. This novel argument has a concocted quality: because IWMS services are alleged to be "simple," plaintiffs urge this court to infer from the pleadings that (1) consumers handy with a screwdriver might do IWMS work themselves and thus be "competitors" of the defendants; and (2) defendants' actions have somehow excluded these consumers from "competing" in the marketplace. Plaintiffs' first problem is that the complaint lacks any explicit allegation that plaintiffs are competitors. On a motion to dismiss for failure to state a claim, "the district court is limited to the facts alleged in the complaint or counterclaim, not those raised for the first time by counsel in its legal memorandum." *MCI Telecommunications Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 128–29 (D.N.J.1995); Fed.R.Civ.P. 12(b)(6).

 Even if the complaint actually alleged that plaintiffs were competitors, it would still fail to sustain a viable claim. The term "anti-competitive" "refers not to actions that merely injure individuals" but rather "to actions that harm the competitive process." *Clamp–All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 486 (1st Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). No evidence of such action is either explicitly alleged or fairly inferable from the complaint.

For the foregoing reasons plaintiffs' claims, for both actual and attempted monopolization must be dismissed.

## D. THE "LEVERAGING" CLAIM

 Plaintiffs also allege that the defendants have "leveraged their monopoly power over regulated utility telephone service and billing to gain a competitive advantage" in the IWMS market. Am. Compl. at ¶ 22. This "leveraging" theory collapses under the weight of contrary authority, either as support for plaintiffs' monopolization and attempted monopolization counts, or as an independent cause of action.

In *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), the Supreme Court held that section 2 "makes the conduct of a single firm unlawful *only when it actually monopolizes or dan-*

*gerously threatens to do so." Id.* at 459, 113 S.Ct. at 892 (emphasis supplied). Although the circuits are not unanimous, the clear weight of authority has rejected claims under section 2 based upon leveraging to gain competitive advantage. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 206 (3d Cir.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Alaska Airlines v. United Airlines, Inc.,* 948 F.2d 536, 548 (9th Cir.1991), *cert. denied,* 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992); *Advanced Health–Care Services v. Giles Memorial Hosp.,* 846 F.Supp. 488, 496–97 (W.D.Va.1994); *Adcom, Inc. v. Nokia Corp.,* 812 F.Supp. 81, 84 (E.D.La.1993). *But see Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)(supporting leveraging theory); *Ortho Diagnostic Sys. Inc. v. Abbott Labs., Inc.,* 920 F.Supp. 455, 465 n. 13 (S.D.N.Y.1996) (*Berkey* considered binding upon lower court).

The logic of *Fineman* and *Alaska Airlines* is particularly powerful in this case, where the complaint fails to offer facts sufficient to state a claim that defendants have violated section 2 through the exercise of monopoly power, or through an attempt to gain monopoly power, in the IWMS market. There is simply no viable cause of action for monopolization for this "leveraging" theory to support.

### E. RECENT DECISIONAL LAW

Two recent cases, one involving cable television services and the other involving IWMS, strongly support the court's position here.

In *Hahn v. Rifkin/Narragansett S. Fla. CATV,* 941 F.Supp. 1196, 1199–1201 (S.D.Fla. 1996) the district court denied standing to cable television consumers alleging attempted monopolization under section 2, relying on *Davis v. Southern Bell Tel. & Tel. Co.,* No. 89–2839–CIV–NESBITT, 1994 WL 912242, at *16 (S.D.Fla. Feb. 1, 1994) and *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438 (11th

Cir.1991). The logic of the Hahn decision directly buttresses this court's conclusion that the plaintiffs in this case, as consumers, cannot offer a claim of attempted monopolization.

Even more closely on point is *Simpson v. U.S. West Communications, Inc.,* 957 F.Supp. 201 (D.Or.1997). In *Simpson,* as in this case, the defendants provided IWMS through a "positive option" contract. Judge Redden found that the plaintiffs could not prove monopoly power, *id.* at 204, demonstrated no evidence of "exclusionary or predatory conduct," *id.,* and failed to offer evidence of antitrust injury. *Id.* at 205. Relying on *Spectrum Sports,* Davis, and *In re Air Passenger,* the court also found that, as consumers, the IWMS customers lacked standing to assert an attempt claim. *Id.* at 205–06.[3]

### F. STATE LAW CLAIMS

Given that plaintiffs' complaint lacks any supportable claim under federal law, this court will exercise its discretion to dismiss the state common law and statutory claims, on the authority of *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### IV. CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss is hereby ALLOWED. The clerk will enter a judgment of dismissal.

A separate order will issue.

---

**3.** The contrary, unpublished decision from the Western District of Michigan, offered by plaintiffs, is anomalous and unpersuasive.